## G. A. WHITFORD v. NORTH STATE LIFE INSURANCE COMPANY.

### (Filed 8 October, 1913.)

1. **Husband and Wife—Confidential Communications—"During Marriage"—Evidence.**

    The confidential communications made between husband and wife which neither will be compelled to disclose, are, by the express language of the statute, those which are communicated "during their marriage," and construing the statute, in connection with the common law, it does not extend to papers about business matters left by the husband in his desk with the apparent intent that they should come into the hands of his wife after his death.

2. **Same—Interpretation of Statutes.**

    The language of our statute in regard to communications between husband and wife is that "no husband or wife shall be compellable to disclose any confidential communication made by one to the other during their marriage," and the meaning thereof is clearly conveyed by the words employed, free from any ambiguity, that such communications be made, as stated, during the marriage; and hence it may not be extended, by interpretation, so as to include letters or papers, not of a confidential character, written by the husband to the wife, which he intended she should not receive until after his death.

3. **Same—Insurance—"Suicide"—Business Communications—Declarations Against Interest—Evidence.**

    Written communications from the husband to the wife containing directions to her with regard to business transactions are not privileged communications under our statute; and where a husband had written to his wife instructions as to his business affairs, to be followed by her after his death, wherein it evidently appeared he was contemplating suicide, these communications are not privileged in an action upon his life insurance policy, wherein the defense of suicide was interposed, it appearing that he suddenly died shortly after writing the communication to his wife, and that the papers were thereafter found in his desk, evidencing the intent that she should not sooner receive them; and in this case the papers left under such circumstances are held to be competent evidence as declarations against interest.

APPEAL by plaintiff from *O. H. Allen, J.,* at April Term, 1913, of CRAVEN.

This is an action to recover upon a policy of insurance issued by the defendant on 29 December, 1910. The insured died on 13 May, 1911.

The defendant denied liability and set up as a defense that W. W. Burgess, the insured, in violation of the terms of the policy and of the application therefor, committed suicide, and the further defense that the policy was void for the reason that the applicant, W. B. Burgess, had made material false representations in his application for the insurance.

The defendant introduced in evidence on the issue of suicide the following papers:

*To My Wife:*

Telegraph Joe Latham to come to you at once.

Look out for my Royal Arcanum and Heptasophs.

My Union Central policy is in the hands of the company as collateral for $180; there is $1,000 available on it.

Look into one of the little drawers and you will find a policy in the North State Mutual for $1,500; they hold my note for the premium, but the interest is paid on it up to May 30th; see if you can collect on it.

Tell Joe to write Carey J. Hunter for instruction in regard to the Union Central.

I owe Sam King $20.

I owe Gus Pritchard (colored) $50. Allen Jenkins (colored) $20.

(over)

Sell the place for what you can get, pay Mr. Cannaday, and take the rest and do the best you can.

God bless you and the children. Goodbye,

BAT.

Sam can tell you of the other colored people.

This note was in an envelope, and on the back of the envelope the following was written:

"To Mam—Important.

"Mrs. W. B. Burgess.

"See Eugene Wood and get him to bury me and wait until you get insurance."

Plaintiff excepted.

Notice was duly served on the plaintiff to produce said papers on the trial.

The papers were written by the husband, but were not delivered by the insured to his wife, nor did she know of the existence of either until after the death of her husband, when they were brought to her from the private desk of her husband by one of her children. She then gave them to G. A. Whitford before his qualification as administrator, and he retained them until a few days before the trial, and after notice had been served on him, when he returned them to the wife.

The indorsement on the envelope was shown to Eugene Wood, who was undertaker and coroner, and upon request the papers were delivered to the coroner's jury at the inquest, but it does not appear that the paper inclosed in the envelope was read.

The jury returned the following verdict:

1. Did the defendant insure the life of W. B. Burgess in the sum of $1,500, as alleged in the complaint? Answer: Yes.

2. Did the insured, W. B. Burgess, die by his own hand, with intent to commit suicide? Answer: Yes.

3. Did the assured, W. B. Burgess, represent that he had had no serious illness or disease other than that stated in the application? Answer: Yes.

4. Was said representation untrue? Answer: Yes.

5. Was such representation material? Answer: Yes.

6. What sum, if any, is the plaintiff entitled to recover? Answer: ......

Judgment was entered in accordance with the verdict, and the plaintiff excepted and appealed.

*Guion & Guion for plaintiff.*
*Rouse & Land for defendant.*

ALLEN, J. The statute of this State as to communications between husband and wife provides that "No husband or wife shall be compellable to disclose any confidential communication made by one to the other during their marriage," and it is by this statute, construed in connection with the rules of the common law as to what communications are confidential, that the admissibility of the papers introduced in evidence is to be tested. The inquiry naturally resolves itself into two propositions:

1. Are the papers communications from the husband to the wife during marriage?

2. If so, are they confidential?

We will consider the two propositions together. The reasons for the rule preventing the disclosure of confidential communications between husband and wife, as enforced at common law, are well stated by *Taylor, C. J.,* in *Mercer v. State,* 40 Fla., 216: "Society has a deeply rooted interest in the preservation of the peace of families, and in the maintenance of the sacred institution of marriage; and its strongest safeguard is to preserve with jealous care any violation of those hallowed confidences inherent in, and inseparable from, the marital status. Therefore the law places the ban of its prohibition upon any breach of the confidence between husband and wife, by declaring all confidential communications between them to be incompetent matter for either of them to expose as witnesses. . . . The reason of the rule for excluding the confidences between husband and wife as incompetent matter to be deposed by either of them, though they may be competent witnesses to testify to other facts, is found to rest in that public policy that seeks to preserve inviolate the peace, good order, and limitless confidence between the heads of the family circle so necessary to every well-ordered civilized society"; and *Judge Daniel* admonishes us in *Hester v. Hester,* 15 N. C., 228, that "the rule should not be extended to the exclusion of truth beyond the limits within which the reason of the law calls for it."

Words in a statute are to be construed as they are ordinarily understood, and where "the language is plain and admits of but one meaning, the task of interpretation can hardly be said to arise. It is, therefore, only in the construction of statutes whose terms give rise to some ambiguity, or whose grammatical construction is doubtful, that courts can exercise the power of controlling the language in order to give effect to what they suppose to have been the real intention of the lawmakers. Where the words of a statute are plainly expressive of an intent, not rendered dubious by the context, the interpretation must conform to and carry out that intent. It matters not, in such a case, what the consequences may be. It has, therefore, been distinctly stated, from early times down to the present day, that judges are not to mold the language of the statutes in order to meet an alleged convenience or an alleged equity; are not to be influenced by any notions of hardship, or of what in their view is right and reasonable or is prejudicial to society; are not to alter clear words, though the Legislature may not have contemplated the consequences of using them; are not to tamper with words for the purpose of giving them a construction which is 'supposed to be more consonant with justice' than their ordinary meaning." Endlich Inter. Stat., sec. 4.

"The object of all interpretation and construction of statutes is to ascertain the meaning and intention of the Legislature, to the end that the same may be enforced. This meaning and intention must be sought, first of all, in the language of the statute itself. For it must be presumed that the means employed by the Legislature to express its will are adequate to the purpose and do express that will correctly. If the language of the statute is plain and free from ambiguity and expresses a single, definite, and sensible meaning, that meaning is conclusively presumed to be the meaning which the Legislature intended to convey." Black on Inter. Statutes, pp. 35 and 36.

The words of the statute under consideration are "communications made by one to the other during marriage."

Communicate, as defined by Webster, is to bestow, to convey, to make known, to recount, to import; as to communicate in-

formation to any one, and communication is the act of communicating; and it would seem that a paper, although directed to the wife, of which she had no knowledge and which it was not expected she would see until after the death of the husband, is not a communication during marriage.

The language indicates either that the information should be actually imparted, or, at least, that there should be an expectation of doing so, during marriage.

If, however, the papers introduced in evidence are communications from the husband to the wife, the statute does not render them incompetent unless they are confidential. A perusal of the papers discloses that all the statements made are in regard to business matters; that the directions given could not be performed without disclosing the contents of the papers, and that the husband expected this would be done, and in many respects the papers are testamentary in character.

In 40 Cyc., 2355, the author says: "Communications between husband and wife in respect to purely business matters are not privileged," and the text is supported by the decided cases: *Spitz's Appeal,* 56 Conn., 184; *Parkhurst v. Birdell,* 110 N. Y., 386; *Hanks v. Van Gardner,* 59 Iowa, 181; *Sedgwick v. Turner,* 90 Ind., 281.

We are also not without authority upon the question in our own State. In the *Hester case* before referred to, *Judge Daniel* says: "The rule upon the subject of confidential communications is not denied; the sanctity of such communications will be protected. Persons connected by the marriage tie have, as was said at the bar, the right to think aloud in the presence of each other. But the question remains, What communications are to be deemed confidential? Not those, we think, which are made to the wife, to be by her communicated to others; nor those which the husband makes to the wife as a matter of fact upon which a thing is to operate after his death, when it must be the wish of the husband that the operation should be according to the truth of the fact, as established by his declaration. Suppose a husband were to disclose to his wife that he has given to one of their children a horse, can she not after his death prove that as against the executor? Suppose, also, that

the declaration to which the wife was called had been to her and another, there is no reason why she, if she will, may not testify to it,. as well as the other. Why? Because it is then apparent that it was not confidential between the husband and wife, in the sense of the rule. The same reason equally applies when, from the subject of the conversation, it is obvious he did not wish it concealed, but, on the contrary, must have desired to make it known, and through her, if he found no other means of doing it."

Note that the learned and accurate judge says, among other things, that the rule does not apply to those communications which "the husband makes to the wife as to a matter of fact upon which a thing is to operate after his death," and it will be seen that it fits each statement in the papers objected to.

This case was approved in *Gaskill v. King,* 34 N. C., 213, in which the widow was permitted to testify that her husband handed the deed in question to her, and told her to take care of it for Anson, and have it proved and recorded for him, whenever she pleased; that she then took it, and put it in her trunk, separate from her husband's papers, and he never saw it afterwards to her knowledge; and that he died in 1836, and shortly afterwards she had the deed proved and registered. .

We are, therefore, of opinion, having in view the reason for the rule, the language employed in the statute, the fact that the wife had no knowledge of the papers until after the death of her husband, that it appears from the papers and the attendant circumstances that she was not expected to do so, and the subject-matter of the papers, that they are not confidential communications made by the husband to the wife during marriage, within the meaning of the statute, and were properly admitted in evidence, as declarations against interest.

We at first thought the case of *S. v. Wallace,* 162 N. C., 622, was decisive of this in favor of the defendant, but the two cases rest upon different principles, and the distinction between the two is that in the *Wallace case* the letter reached the wife during the life of the husband, and came into the hands of a third person without the connivance or consent of the wife, while in this, the wife knew nothing of the papers until after

the death of her husband, and she gave them to another person.

This disposes of the only material exception upon the second issue, and as the finding on that issue precludes a recovery by the plaintiff, it is not necessary to discuss the exceptions arising on the other issues.

No error.