STATE OF NORTH CAROLINA v. MICKEY VONRICE ROLLINS

No. 138PA08

(Filed 1 May 2009)

**Evidence— marital privilege—spouse visiting prisoner**

An inmate had no reasonable expectation of privacy in conversations with his wife in the public visiting areas of Department of Correction facilities, and the conversations were not protected by the marital communications privilege set forth in N.C.G.S. § 8-57(c).

Justice TIMMONS-GOODSON dissenting.

Chief Justice PARKER and Justice HUDSON join in this dissenting opinion.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 189 N.C. App. 248, 658 S.E.2d 43 (2008), reversing both an order entered 19 August 2005 by Judge William C. Griffin, Jr. and a judgment entered 6 October 2006 by Judge Jack W. Jenkins, in Superior Court, Martin County, and remanding the case for a new trial. Heard in the Supreme Court 25 February 2009.

*Roy Cooper, Attorney General, by Robert C. Montgomery, Special Deputy Attorney General, for the State-appellant.*

*Staples S. Hughes, Appellate Defender, by Barbara S. Blackman, Assistant Appellate Defender, for defendant-appellee.*

BRADY, Justice.

In this case we consider whether the marital communications privilege preserved in N.C.G.S. § 8-57(c) protects conversations between a husband and wife that occur in the public visiting areas of state correctional facilities. After extensive review of the history of the marital communications privilege in North Carolina and the rights granted to prisoners in correctional institutions, we conclude that the privilege does not extend to communications occurring in the public visiting areas of North Carolina Department of Correction (DOC) facilities because a reasonable expectation of privacy does not exist in such areas.

## FACTUAL AND PROCEDURAL BACKGROUND

On 11 June 2002, eighty-eight-year-old Harriett "Brownie" Highsmith was found murdered in her Robersonville, North Carolina residence. Mickey Vonrice Rollins (defendant) was seen in the vicinity of Highsmith's residence on the afternoon of the murder[1] and was identified by law enforcement as a person of interest. In September 2002 defendant's wife, Tolvi Rollins, was interviewed by Special Agent Walter Brown of the State Bureau of Investigation (S.B.I.) about the murder. Mrs. Rollins indicated that she had no pertinent information concerning the crime.

Highsmith's murder remained unsolved and law enforcement received no new leads in the investigation until fall of 2003. At some time following the Highsmith murder defendant was incarcerated for an unrelated crime. In September 2003, Mrs. Rollins was arrested for felony witness intimidation for threats allegedly made to a witness involved with defendant's trial in the unrelated matter. S.B.I. Agent Brown was present at Mrs. Rollins's arrest and again asked if she had any information about the Highsmith murder. Mrs. Rollins gave Agent Brown no information at that time, but the next month she voluntarily contacted Robersonville Police Chief Darrell Knox. Mrs. Rollins told Chief Knox that in March 2003, defendant confessed to her that he had killed Highsmith. Mrs. Rollins told Chief Knox that her conscience had been bothering her "for some time" and that she had tried to contact him several times, but could never reach him. When Mrs. Rollins communicated this information to Chief Knox there was a reward being offered for information in the Highsmith case.

The next day, 14 October 2003, S.B.I. Agent Brown interviewed Mrs. Rollins. The details Mrs. Rollins provided concerning the murder were consistent with evidence found at the crime scene. Agent Brown asked Mrs. Rollins if she would wear a recording device and visit defendant in prison. Mrs. Rollins agreed to do so.

Over the next two months, Mrs. Rollins visited defendant on five occasions at three different correctional facilities. Each meeting took place in public visiting areas of the facilities. During each visit, defendant admitted to killing Highsmith and discussed details of the crime. On three of the visits Mrs. Rollins wore a recording device;

---

1. As a teenager, defendant lived across the street from Highsmith with his aunt. Defendant and Highsmith developed a friendship while defendant lived in the neighborhood. Highsmith took an interest in defendant's high school football career and would often give him gifts to encourage him before his high school football games.

however, the first recording was inaudible because of the loud noises surrounding the couple in the DOC visiting room. After each visit with defendant, Mrs. Rollins informed law enforcement as to the contents of her conversations with defendant. Consistent with standard law enforcement procedure, Mrs. Rollins received money to reimburse her for expenses she incurred during the course of her visits with defendant. She received a total of $840 from the S.B.I. and the Robersonville Police Department for various expenses.

Defendant was arrested for the murder of Highsmith on 5 December 2003. On 2 February 2004, a Martin County Grand Jury returned true bills of indictment charging defendant with murder, first-degree kidnapping, robbery with a dangerous weapon, and breaking or entering. On 13 September 2004 defendant filed a motion to suppress the statements he made to his wife regarding the Highsmith murder. The motion to suppress was denied at a 27 June 2005 hearing in Superior Court, Martin County.[2] A written order, consistent with the 27 June 2005 order, was entered on 19 August 2005.

Defendant pleaded guilty on 6 October 2006 in exchange for imposition of a sentence of life imprisonment without parole. With the plea, defendant reserved the right to appeal from the order denying his motion to suppress. The trial court, in accordance with the plea arrangement, sentenced defendant to life imprisonment without parole.

On 10 October 2006, defendant filed notice of appeal to the Court of Appeals. In an 18 March 2008 opinion, the Court of Appeals reversed the denial of defendant's motion to suppress, ruling that the marital communications privilege protected defendant's statements to his wife made in the public visiting areas of the DOC. The Court of Appeals remanded the case for a new trial. This Court allowed the State's petition for discretionary review on 26 August 2008.

## ANALYSIS

This case requires us to examine the definition of a "confidential communication" under North Carolina law. Defendant argues that the conversations between his wife and him that occurred in the DOC facilities are protected as confidential communications under N.C.G.S. § 8-57(c). The State contends that these conversations lack the requisite expectation of privacy essential to a confidential com-

2. Defendant also filed a second motion to suppress relating to an issue that is not before this Court.

munication and thus, they are not protected. We conclude that the conversations between defendant and his wife in the public areas of DOC facilities do not qualify as confidential communications under section 8-57(c).[3]

## History of the Marital Communications Privilege

Section 8-57 is a product of the continually evolving common law marital privileges that historically sought to promote credibility and protect the intimacy of the marital union. The traditional common law rule, which can be traced as far back as 1580, disqualified one spouse from testifying for or against the other spouse in a criminal action on the basis of incompetency[4]. As the Supreme Court of the United States explained in *Trammel v. United States*,

> [The rule] sprang from two canons of medieval jurisprudence: first, the rule that an accused was not permitted to testify in his own behalf because of his interest in the proceeding; second, the concept that husband and wife were one, and that since the woman had no recognized separate legal existence, the husband . was that one."

445 U.S. 40, 44 (1980). This spousal incompetency rule, and its underlying justifications, survived well into the nineteenth century, although statutory modifications and exceptions were numerous. *See* James P. Nehf, Note, State v. Freeman: *Adverse Marital Testimony in North Carolina Criminal Actions—Can Spousal Testimony Be Compelled?*, 60 N.C. L. Rev. 874, 877 n.24 (1982) [hereinafter, *Adverse Marital Testimony*].[5] The exceptions to the rule made clarification of the privilege necessary, and in the mid-nineteenth century, the specific marital communications privilege emerged. *Id.* at 878. This priv-

---

3. The trial court made no ruling whether the March 2003 conversation between defendant and Mrs. Rollins was protected by the marital privilege, and we decline to address that issue, as it is not before the Court.

4. The first written recognition of a marital privilege is found in the 1580 case of *Bent v. Allot*, in which a husband was allowed to suppress adverse testimony by his wife. *Bent v. Allot*, (1579-80) 21 Eng. Rep. 50 (Ch). Nearly fifty years later, Lord Coke wrote in his legal commentaries: "[I]t hath been resolved by the justices, that a wife cannot be produced either against or for her husband . . . and it might be a cause of implacable discord and dissention between the husband and the wife" 1 Edowardo Coke, *A Commentary upon Littleton* ch. 1, § 1, subsec. 6.b (Francis Hargrave & Charles Butler eds., Philadelphia, Small 19th ed. 1853) (1628) (footnote omitted).

5. For example, the rule preventing spouses from testifying on behalf of one another was abandoned in the early 20th century. 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 59 (2d. rev. ed. 1982); *see also State v. Rice*, 222 N.C. 634, 24 S.E.2d 483 (1943).

ilege is distinct from the spousal incompetency rule of the common law, in that it protects confidential communications between spouses made during the marriage.[6] Unlike the spousal incompetency rule, which seeks to promote credible testimony, the marital communications privilege is premised upon the belief that the marital union is sacred and that its intimacy and confidences deserves legal protection. *See Hicks v. Hicks*, 271 N.C. 204, 205, 155 S.E.2d 799, 800 (1967) (" '[W]hatever is known by reason of that intimacy [marriage] should be regarded as knowledge confidentially acquired, and that neither [husband nor wife] should be allowed to divulge it to the danger or disgrace of the other.' " (quoting *State v. Jolly*, 20 N.C. 86, 89, 20 N.C. 108, 112 (1838) (alterations in the original))).

In 1868 the North Carolina General Assembly preserved both the spousal incompetency rule and the marital communications privilege of the common law in our statutes. *See* Victor C. Barringer, et al., *The Code of Civil Procedure of North Carolina* tit. XIV, ch. VI, § 341 (Raleigh, Paige 1868) (discussing marital privilege as related to both civil and criminal proceedings). However, the *Freeman* decision in 1981 modified the common law spousal incompetency rule, prompting the legislature's enactment of the current section 8-57. *See State v. Holmes*, 330 N.C. 826, 828-35, 412 S.E.2d 660, 661-64 (1992) (detailing the history of the enactment of and legislative changes to section 8-57). The first two subsections of the current section 8-57 reflect the *Freeman* holding, establishing that one spouse is *competent*, but not *compellable*, to testify against another in a criminal proceeding, except in a few specific situations. N.C.G.S. § 8- 57(a),(b) (2007). The codification of the marital communications privilege remains intact and is preserved in subsection 8-57(c).

Subsection 8-57(c) states: "No husband or wife shall be compellable in any event to disclose any confidential communication made by one to the other during their marriage." This Court has ruled that the privilege is held by both spouses—meaning that either spouse can prevent the other from testifying to a confidential communication. *Holmes*, 330 N.C. at 834, 412 S.E.2d at 665 (stating that subsection 8-57(c) protects the defendant's privilege "to keep the other spouse *in any event* from disclosing any confidential communication made by one to the other during their marriage").

---

6. We recognize that these two privileges have often been confused and commingled in our jurisprudence. *See State v. Freeman*, 302 N.C. 591, 276 S.E.2d 450 (1981); *Adverse Marital Testimony* at 878. Despite the past confusion, we emphasize that the two privileges are separate protections, with unique justifications.

**STATE v. ROLLINS**

[363 N.C. 232 (2009)]

## Confidential Communication

To assess whether the conversations between defendant and his wife were in fact protected by subsection 8-57(c), our analysis turns on whether there was a "confidential communication" between defendant and his wife in the DOC facilities. When defining a confidential communication in the context of the marital communications privilege, this Court has asked "whether the communication . . . was induced by the marital relationship and prompted by the affection, confidence, and loyalty engendered by such relationship." *State v. Freeman*, 302 N.C. 591, 598, 276 S.E.2d 450, 454 (1981) (citations omitted); *see also Holmes*, 330 N.C. at 828, 412 S.E.2d at 661 (stating a confidential communication is "information privately disclosed between a husband and wife in the confidence of the marital relationship" (citing *Trammel*, 445 U.S. 40)).

Other considerations have also influenced our previous determinations of whether certain communications qualify as "confidential." The circumstances in which the communication takes place, including the physical location and presence of other individuals, have been relevant when answering the question: "Has the veil of confidence been removed . . . ?" *Hicks*, 271 N.C. at 206, 155 S.E.2d at 801. Defendant argues that the setting and physical circumstances of the communication are irrelevant in analyzing whether the privilege applies, but we find that argument unsupported by precedent.

For instance, in *Freeman*, this Court ruled that a defendant's incriminating statement to his wife in a public parking lot while in the presence of the wife's brother was not a confidential communication. 302 N.C. at 598, 276 S.E.2d at 454-55. On the other hand, this Court determined a marital communication to be confidential in *Holmes* when the defendant ordered two men out of his home before making a statement to his wife that he was going to kill one of them. 330 N.C. at 835, 412 S.E.2d at 665. Likewise, in *Hicks*, communications between a husband and wife were confidential when made in the basement of the couple's home, even though their eight-year-old daughter was " 'singing or playing in the area.' " 271 N.C. at 205-07, 155 S.E.2d at 800-02. This Court in *Hicks* noted that the factual circumstances surrounding the wife's utterances stamped them as confidential. *Id.* at 207, 155 S.E.2d at 802. These cases illustrate that actual physical privacy, as well as a desire for and ex-

pectation of confidentiality, are important in establishing a confidential communication.[7]

Legal scholars have also noted that physical privacy is germane to the existence of a confidential communication:

> The situs of the communication is a relevant factor in determining whether there was the requisite confidentiality at the time of the communication. It is possible to have a confidential conversation in a public place, but the public nature of the situs makes it more difficult to find the requisite privacy. The layperson must have a reasonable expectation of confidentiality.

Edward J. Imwinkelried, *The New Wigmore: A Treatise on Evidence* § 6.8.1, at 674-75 (Richard D. Friedman ed. 2002) (footnotes omitted); *see also* Robert P. Mosteller et al., *North Carolina Evidentiary Foundations* § 8-2, at 8-6 (2d ed. 2004) (stating that a confidential communication requires "(1) physical privacy, and (2) an intent on the holder's part to maintain secrecy").

Essential to the question of determining whether the "veil of confidentially [has] been removed" from a marital communication are the physical surroundings and intent of the husband and wife in making the communication. For purposes of a confidential marital communication under subsection 8-57(c), there must be a reasonable expectation of privacy on the part of the holder and the intent that the communication be kept secret. Relevant factors in making this determination necessarily include the physical location where the communication is made and whether there are other individuals present at the time of the communication.[8]

---

7. The intention of the person disclosing information that the communication remain a secret is consistent with privileges in other confidential relationships outside of marriage. *See, e.g., State v. McIntosh*, 336 N.C. 517, 523, 444 S.E.2d 438, 442 (1994) ("[T]he justification for granting the [attorney-client] privilege ceases when the client does not appear to have been desirous of secrecy." (citations and internal quotation marks omitted)).

8. This analysis for determining the existence of a confidential communication is in line with other jurisdictions that have specifically defined the term in the context of a marital communication. *See, e.g., People v. Von Villas*, 11 Cal. App. 4th 175, 220, 15 Cal. Rptr. 2d 112, 138 (Cal. Ct. App. 1992) (holding that to make a marital communication in confidence, "one must intend nondisclosure and have a reasonable expectation of privacy" (citation and internal quotation marks omitted)), *cert. denied*, 510 U.S. 838 (1993).

## Reasonable Expectation of Privacy in Public Visiting Areas of Department of Correction Facilities

The State contends that defendant had no reasonable expectation of privacy in any conversation that took place in a public visiting area of DOC facility, and therefore, the communications between defendant and Mrs. Rollins were not protected. We agree.

There is no question that incarcerated persons have a diminished expectation of privacy. "Given the realities of institutional confinement, any reasonable expectation of privacy a detainee retains necessarily is of diminished scope." *State v. Wiley*, 355 N.C. 592, 603, 565 S.E.2d 22, 32 (2002), *cert. denied*, 537 U.S. 1117 (2003); *see also Bell v. Wolfish*, 441 U.S. 520, 557 (1979). For purposes of the Fourth Amendment to the United States Constitution, the Supreme Court of the United States has stated that the traditional right to privacy is "fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Hudson v. Palmer*, 468 U.S. 517, 527-28 (1984). Prisoners in confinement know, or should know, that their statements may be monitored and even recorded. *See United States v. Paul*, 614 F.2d 115, 116 (6th Cir.) ("[J]ail officials are free to intercept conversations between a prisoner and a visitor."), *cert. denied*, 446 U.S. 941 (1980); *see also Lanza v. New York*, 370 U.S. 139, 143 (1962) ("[T]o say that a public jail is the equivalent of a man's 'house' or that it is a place where he can claim constitutional immunity from search or seizure . . . is at best a novel argument. . . . In prison, official surveillance has traditionally been the order of the day." (footnotes omitted)).

While prisoners have a diminished expectation of privacy during confinement, this is not to say that their communications can never be private and completely confidential. Certain relationships, such as those between an attorney and client, are "endowed with particularized confidentiality" and "must continue to receive unceasing protection" even in prisons. *Lanza*, 370 U.S. at 143-44. For this reason, prisoners are given great latitude when speaking with their attorneys. However, even in these situations, special actions must be taken to ensure the confidentiality of these communications. For instance, letters between a prisoner and counsel must be identified as legal correspondence in order to receive protection. *See Wolff v. McDonnell*, 418 U.S. 539, 576 (1974) (holding that a state may "require any [attorney-client] communications to be specially marked as originating from an attorney . . . if they are to receive special treatment").

**STATE v. ROLLINS**

[363 N.C. 232 (2009)]

As this Court has stated, the union of husband and wife is a "sacred institution" and its preservation and protection are "necessary to every well-ordered civilized society." *Whitford v. N. State Life Ins. Co.*, 163 N.C. 179, 182, 163 N.C. 223, 226, 79 S.E. 501, 502 (1913). However, as with other confidential relationships, the protection afforded marital communications is not absolute and is inapplicable when no reasonable expectation of privacy exists. In the instant case, any reasonable expectation of privacy in the marital communications evaporated because each conversation took place in the public visiting areas of DOC facilities. As *McCormick on Evidence* states:

> The rationale that the spouses may ordinarily take effective measures to communicate confidentially tends to break down where one or both are incarcerated. However, communications in the jailhouse are frequently held not privileged, often on the theory that no confidentiality was or could have been expected.

1 Kenneth S. Broun et al., *McCormick on Evidence* § 82, at 377 (6th ed. 2006) (footnote omitted). This is not to say that special precautions cannot be taken in correctional institutions to protect the privacy of conversations between a husband and wife, just as precautions can be taken between prisoners and their attorneys.[9] However, communications occurring during ordinary DOC visits, in public visiting areas, do not invoke the protection subsection 8-57(c) affords to confidential communications because there is no reasonable expectation of privacy in such communications.

The record clearly shows that the conversations between defendant and his wife occurred during routine DOC visits and thereby lacked any reasonable expectation of privacy. During each visit defendant and his wife were in public visiting areas of DOC correctional facilities, in the presence of other people. Mrs. Rollins testified that at times other people were in close proximity and even spoke to defendant and her during the course of their conversations. Furthermore, it can be inferred from the record that defendant doubted the privacy of the couple's conversations. On one occa-

---

9. For example, we note two California cases in which confidential marital communications between husband and wife were also statutorily protected. In one, a conversation between a detainee-defendant and his wife that occurred in a police detective's office was protected because the couple were lulled into believing that the conversation was covered by the cloak of confidentiality. *North v. Superior Court*, 8 Cal. 3d 301, 311, 502 P.2d 1305, 1311 (1972) (en banc). However, the same protection was not extended to marital conversations which occurred in an "ordinary jailhouse visiting area" because there was "no justifiable expectation of privacy." *Von Villas*, 11 Cal. App. 4th at 220-21, 15 Cal. Rptr.2d at 139.

sion defendant physically inspected Mrs. Rollins to check for the presence of a recording device. Mrs. Rollins also told S.B.I. agents that defendant refrained from telling her particular details of the Highsmith murder during one meeting, but said he would tell her "something important" later, after he was released from prison and the two had "pillow talk."[10]

## CONCLUSION

As defendant had no reasonable expectation of privacy in the conversations between his wife and him in the public visiting areas of the DOC facilities, the conversations were not confidential communications under subsection 8-57(c) and therefore, are not protected. We reverse the decision of the Court of Appeals as to the issue before us on appeal and hold that the trial court's denial of defendant's motion to suppress under subsection 8-57(c) was appropriate. This case is remanded to the Court of Appeals for consideration of defendant's assignments of error not previously addressed by that court.

REVERSED AND REMANDED.

Justice TIMMONS-GOODSON dissenting.

Because the majority departs from our established case law and holds that the confidential marital communications privilege is defeated simply because the conversation occurred in the visiting area of a prison, I respectfully dissent.

While I agree with the majority that the physical environment in which a marital conversation takes place may be *one* factor in determining whether a particular disclosure is confidential, it is neither the sole nor the determinative factor. The circumstances in the present case indicate that the communication at issue was not overheard by any third party and was clearly induced by the marital relationship. I therefore agree with the Court of Appeals that defendant's communications to his wife are protected by marital privilege. In its analysis, the majority overemphasizes the nature of the general prison setting, instead of focusing on the actual facts presented by this case. In so doing, the majority unnecessarily blurs the line between confidential communications and the "reasonable expectation of privacy" doctrine prevalent in the Fourth Amendment arena.

---

10. Mrs. Rollins explained to S.B.I. agents that "pillow talk" was the time the couple shared in their bed before going to sleep when they would talk about "everything."

STATE v. ROLLINS

[363 N.C. 232 (2009)]

In determining whether a particular statement is privileged as a marital communication, "the question is whether the communication, whatever it contains, was induced by the marital relationship and prompted by the affection, confidence, and loyalty engendered by such relationship." *State v. Freeman*, 302 N.C. 591, 598, 276 S.E.2d 450, 454 (1981) (citations omitted); *see also State v. Holmes*, 330 N.C. 826, 828, 412 S.E.2d 660, 661 (1992) (defining confidential marital communications as "information privately disclosed between a husband and wife in the confidence of the marital relationship" (citations omitted)). There is no question in the present case that defendant's statements to his wife were induced and prompted by the marital relationship. Tolvi Rollins, defendant's wife, testified she married defendant in 2001. Mrs. Rollins verified that when she visited defendant at the Franklin Correctional Center, she was affectionate, kissed defendant, and brought him food. Mrs. Rollins also agreed that defendant trusted her and that she encouraged him to confide in her and promised to return and visit regularly. When Mrs. Rollins visited defendant at the Dan River facility, she was again affectionate, brought defendant a pecan pie, told defendant she "would be there when he got out of prison" and promised she "would never tell anybody about what [defendant] confided in [her] about the death of Mrs. Highsmith." While visiting defendant at the Carteret Correctional Center, Mrs. Rollins again "loved on him" and assured defendant she would "be there for him" and that they would have children together and all "move away." Mrs. Rollins explicitly agreed that defendant's statements to her were confidential. There is no evidence in the present case to indicate that defendant's statements to his wife were prompted by anything other than the affection and confidence of the marital relationship between them.

The only question then becomes whether the communications between defendant and his wife occurred in a confidential and private manner. *See Holmes*, 330 N.C. at 828, 412 S.E.2d at 661. Such determination necessarily encompasses *some* consideration of the physical environment at the time of the disclosure, but this Court has never held that actual physical privacy is necessary for a confidential communication, the majority's assertions to the contrary notwithstanding. Rather, this Court has repeatedly emphasized (1) the intent of the parties and (2) whether the communication was made in the presence of third parties capable of both hearing and comprehending the conversation. For example, in *Hicks v. Hicks*, 271 N.C. 204, 207, 155 S.E.2d 799, 801-02 (1967), the Court held that the presence of the married couple's eight-year-old daughter, who was " 'singing or play-

ing in the area' " at the time of the marital communications, did not remove the marital veil of confidence, because the parties intended their conversations to be private, and because the child was not competent "to comprehend the conversation[s]." The Court did not mention the situs of the marital communications—the basement of the couple's home—in its analysis. *Id.* Likewise, in *Holmes*, the Court focused on the fact that the "defendant's statements [were] made only in the presence of his wife [and] were induced by the confidence of the marital relationship." 330 N.C. at 835, 412 S.E.2d at 665 (citing *Hicks*). That the statements occurred in the home merited no discussion by the Court in *Holmes*. *See id; see also State v. Freeman*, 197 N.C. 376, 378-79, 148 S.E. 450, 451 (1929) (holding that remarks made by the defendant and his wife to each other in the presence of police officers were not confidential communications). Thus, I disagree with the majority's emphasis upon the public versus private nature of the physical locale in which the communication occurs.

Here, the evidence shows that, although defendant and his wife met in public visiting areas of the various facilities, they took steps to ensure the confidential nature of their communications, and their communications did not occur in the immediate presence of any third party who overheard or comprehended them. Mrs. Rollins repeatedly and explicitly testified that defendant's statements were made to her in confidence, that nobody else was listening, that no one else could hear them, and that "they were done exclusively so that only [she] and [defendant] could hear the conversation." Thus, all of the evidence shows that defendant and his wife intended to keep their conversations private and, indeed, as noted by the Court of Appeals, succeeded in keeping their conversations private.

The majority states that "the physical surroundings and intent of the husband and wife in making the communication" are "essential to the question of determining whether the 'veil of confidentiality has been removed from a marital communication.' " Instead of analyzing the intent of defendant and his wife and their physical surroundings, however, the majority inexplicably shifts its focus to require "a reasonable expectation of privacy on the part of the holder" in order to assert the privilege. However, this "reasonable expectation of privacy" is a Fourth Amendment concept that need not be applied here and serves only to muddy the already murky waters of our law of confidential communications. *See Holmes*, 330 N.C. at 833, 412 S.E.2d at 664 (noting that the cases and statutes addressing confidential marital communications "have not been models of clarity"). The majority

**IN RE W.R.**

[363 N.C. 244 (2009)]

spends much of its time citing irrelevant Fourth Amendment cases addressing the reasonable expectation of privacy in prisons, ultimately determining that, because defendant could have *no* reasonable expectation of privacy in *any* conversation that took place in the public visiting area of a prison, the communication was not a confidential one entitled to protection. As I have pointed out, however, the evidence in this case shows that the conversations between defendant and his wife were, in fact, private, albeit occurring in a public place. That the public place was a prison should have no bearing on the determination of whether the communication was in fact confidential, except to the extent that actual circumstances show the prison setting prevented confidential communications.

While the majority points to evidence in the record indicating that other persons were present in the prison visiting area, the specific testimony by defendant's wife irrefutably shows that she and defendant intended and succeeded in keeping their conversations private. Under the majority's analysis, even a whispered conversation between husband and wife occurring in a DOC public visiting area would not be considered confidential.

As the actual circumstances here indicate that the communications at issue were both induced by the marital relationship and spoken in a confidential manner, and were neither overheard nor comprehended by any third party, the communications are privileged and entitled to protection as confidential marital communications. I would, therefore, affirm the Court of Appeals.

Chief Justice PARKER and Justice HUDSON join in this dissenting opinion.