TYSON, Judge.
 

 *652
 
 Lesiba Simon Matsoake ("Defendant") appeals from a jury verdict finding him guilty of first-degree rape. We find no error.
 

 I. Background
 

 On the evening of 9 June 2003, S.M. ("the victim") and her boyfriend met with friends at the Port O' Call Restaurant in Kill Devil Hills, North Carolina. When Port O' Call closed around 2:00 a.m., Julia Shefcheck ("Shefcheck"), one of the victim's out-of-town friends, wanted to swim in the ocean. The victim and Shefcheck went onto the beach, which was right across the street from Port O' Call. Shefcheck removed her clothes and went swimming The water was a little rough, and the victim decided not to swim, but did remove her pants to wade out into the surf.
 

 While standing in the surf, the victim "felt like [she] was being stared at [.]" She turned and saw a male standing on the beach. The victim was "freaked out" by the man, and told him "[y]ou need to leave, my friends are coming, my friends are coming." The victim described the individual as a black male, around five foot eleven, and stocky. The man grabbed her, threw her on the ground, and got on top of her. He placed his hands around her neck and forced her to open her knees.
 

 During the course of the victim's testimony at trial, the following exchange occurred:
 

 [Prosecutor]: Did any other parts of [your assailant's] body[, besides his hands,] touch you?
 

 *653
 
 [The victim]: His penis.
 

 [Prosecutor]: Where did his penis touch you?
 

 [The victim]: My vagina.
 

 [Prosecutor]: Do you know whether or not he penetrated your vagina with his penis?
 

 *812
 
 [The victim]: I think he had a couple of times but he was choking me so hard that I was losing my breath and I believed I was going to die.
 

 The victim did not know whether her assailant wore a condom or if he ejaculated. She was also unable to estimate how long her assailant's penis was inside of her. While attempting to fend him off, the victim threw sand in her assailant's eyes. In response, he bit down on two of her fingers on her left hand. After the attack, the assailant ran away down the beach. The victim was taken to the hospital.
 

 The case was assigned to Detective Gene Johnson, Jr. ("Detective Johnson") of the Kill Devil Hills Police Department. Detective Johnson met the victim at Outer Banks Hospital in Nags Head, North Carolina. At the hospital, the victim was examined by Dr. Brian Baxter ("Dr. Baxter") and Marlene Parker ("Parker"), a sexual assault nurse examiner. The examination revealed bruising on the left side of the victims neck, a bite wound on her left hand, and the presence of semen on her skin in the genital area. An internal pelvic examination revealed a large amount of sand in the victim's vagina, along with punctuate erythematous legions on her vagina and cervix, indicating trauma.
 

 Dr. Baxter took swabs and smears from the victim's cervix and vaginal area. The victim told Dr. Baxter she last had sexual relations one week prior to the attack. Parker asked the victim whether her assailant had penetrated her vagina, and Parker testified the victim indicated he had.
 

 The victim worked with a police sketch artist to develop a composite sketch of her assailant. The sketch was circulated among officers and law enforcement agencies, and eventually appeared in the local newspapers.
 

 North Carolina State Bureau of Investigation Special Agent Amanda Thompson ("Agent Thompson") is a forensic scientist manager over the DNA database section at the State Crime Laboratory. Agent Thompson analyzed the vaginal smears taken from the victim, identified and confirmed the presence of sperm.
 

 *654
 
 Shortly after the rape occurred, Defendant and his now ex-wife, Ruth Hart ("Hart"), were traveling from their home in Point Harbor, North Carolina, to a doctor's appointment in Virginia Beach, Virginia. Hart was driving. Defendant was sitting in the passenger seat reading the paper. Over Defendant's objection, Hart testified: "I heard like water, I heard a tear drop hit the paper and I looked over and [Defendant] was crying." Hart stated Defendant was looking at the composite sketch of the victim's assailant as he wept.
 

 Hart knew that around the time of the rape, Defendant would go to bars, including Port O' Call, roughly three or four nights a week. Defendant frequently went by himself, and would stay out until two, three, or four o'clock in the morning. Hart called Crime Stoppers shortly after observing Defendant crying to ascertain whether police had a suspect in the Kill Devil Hills rape. Hart did not disclose Defendant's name as someone who might have been involved in the crime. In 2004, Defendant and Hart moved from Point Harbor to Virginia Beach so Hart could pursue career opportunities. Over the years, Hart would call Crime Stoppers from time to time to ask if police had identified a suspect in the rape. Hart and Defendant divorced in April 2012.
 

 In March 2007, nearly four years after the rape occurred, Hart contacted law enforcement. Hart met with Detective Johnson at the North Carolina/Virginia border. Hart relayed her suspicions about her husband's role in the rape of the victim to Detective Johnson. Hart also told Detective Johnson about a pair of electric hair clippers she had seen Defendant use the morning before. As a result of this conversation, Detective Johnson contacted the Virginia Beach Police Department for assistance on a search warrant to obtain the set of electric hair clippers Hart indicated Defendant used on his head. The search warrant was obtained and executed by the Virginia Beach Police Department. The electric hair clippers were sent to the North Carolina Crime Lab for testing.
 

 The electric hair clippers belonging to Defendant were received and analyzed by Kristin Hughes ("Analyst Hughes"), a North Carolina
 
 *813
 
 State Bureau of Investigation forensic DNA analyst. After analyzing the sperm taken from the vaginal swabbing of the victim and a DNA sample recovered from Defendant's hair clippers, Analyst Hughes concluded "[t]he DNA profile obtained from the sperm fraction of the vaginal swab matched [the] DNA profile from [Defendant's] hair clippers."
 

 On 23 June 2008, Defendant was indicted on one count of first-degree rape. At the time of his indictment, Defendant was living in his native country of South Africa. Defendant was extradited to the United States
 
 *655
 
 in January 2012. Following Defendant's return to the United States, a search warrant for a DNA swab of Defendant's cheek was obtained and executed. This swab was analyzed by Analyst Hughes and compared to the vaginal swabs taken from the victim. The DNA from the sperm fraction of the vaginal swab taken from the victim matched the DNA profile obtained from Defendant.
 

 Defendant's trial began on 18 August 2014. Prior to Hart's testimony, the trial court conducted a
 
 voir dire
 
 of her proposed testimony. When the questions addressed the crying incident, Defendant's counsel stated "[t]his will be an objection, Your Honor, non-verbal communication." The trial court responded "[a]ll right. Go ahead." Hart's proposed testimony continued. After Hart's proposed testimony concluded, the trial court asked Defendant's counsel what objections he had regarding Hart's testimony about when "her husband was crying when he looked at the composite picture." Defendant's counsel argued the crying was a communication and Defendant was making "some sort of tacit admission to some sort of involvement" in the attack which was a "form of nonverbal communication [that] shouldn't be allowed."
 

 The trial court ruled the incident was not covered by the spousal confidential communication. The court reasoned that confidential communication "concerns verbal spoken words which were given in a setting of confidentiality that were prompted by the affection, confidence and loyalty engendered by such relationship" and that "it is completely separate and apart from any other type of action and it is an act, not a communication."
 

 In the course of Hart's testimony in front of the jury, she was asked "[w]hat, if anything, did [she] observe [Defendant] do while holding" the newspaper and looking at the composite sketch of the victim's assailant. At this point, Defendant objected, but did not state any grounds for his objection. Defendant's objection was overruled.
 

 Following the conclusion of the evidence, Defendant objected to the trial court's refusal to give an instruction on attempted rape, which was overruled. The jury returned a verdict finding Defendant guilty of first-degree rape on 21 August 2014. The trial court sentenced Defendant to a minimum of 240 months and a maximum of 297 months in prison. Defendant appeals.
 

 II. Issues
 

 Defendant argues the trial court erred by: (1) failing to exclude the testimony of his former wife, Ruth Hart, about Defendant's reaction
 
 *656
 
 upon seeing the composite sketch of the victim's assailant as a confidential marital communication; and (2) failing to give an instruction on the lesser-included offense of attempted rape.
 

 III. Marital Communication
 

 A. Standard of Review
 

 Whether a privileged confidential communication between Defendant and Hart occurred is a question of law.
 
 See
 

 Medlin v. N.C. Specialty Hosp., LLC,
 
 --- N.C.App. ----, ----,
 
 756 S.E.2d 812
 
 , 820 (2014) (Noting in the context of attorney-client privilege, "the determination of privilege is a question of law[.]"). Questions of law are reviewed
 
 de novo.
 

 In re Appeal of the Greens of Pine Glen Ltd. P'ship,
 

 356 N.C. 642
 
 , 647,
 
 576 S.E.2d 316
 
 , 319 (2003).
 

 B. Analysis
 

 North Carolina's marital communication statute, N.C. Gen.Stat. § 8-57(c), provides: "[n]o husband or wife shall be compellable in any event to disclose any confidential communication made by one to the other during their marriage." N.C. Gen.Stat. § 8-57(c) (2013). The privilege codified at N.C. Gen.Stat. § 8-57(c) "is an extension of the common-law marital communication privilege
 
 *814
 
 that 'allows marriage partners to speak freely to each other in confidence without fear of being thereafter confronted with the confession in litigation.' "
 
 State v. Terry,
 

 207 N.C.App. 311
 
 , 314,
 
 699 S.E.2d 671
 
 , 674 (2010) (quoting
 
 State v. Freeman,
 

 302 N.C. 591
 
 , 596,
 
 276 S.E.2d 450
 
 , 453-54 (1981) ).
 

 Our Supreme Court has ruled the ancient privilege codified in N.C. Gen.Stat. § 8-57(c) "is held by both spouses-meaning that either spouse can prevent the other from testifying to a confidential communication."
 
 State v. Rollins,
 

 363 N.C. 232
 
 , 236,
 
 675 S.E.2d 334
 
 , 337 (2009) (citation omitted);
 
 see also
 

 State v. Britt,
 

 320 N.C. 705
 
 , 709 n. 2,
 
 360 S.E.2d 660
 
 , 662 n. 2 (1987) (citation omitted) ("[W]e have said that a spouse's testimony is ... incompetent if the substance of the testimony concerns a confidential communication.").
 

 Whether the crying incident recounted by Hart to the jury was protected by the marital communication privilege turns on whether a privileged confidential communication occurred between Defendant and his then-wife.
 
 See
 

 Rollins,
 

 363 N.C. at 236
 
 ,
 
 675 S.E.2d at 337
 
 . Hart did not testify about any statements or conversations between herself and Defendant. Defendant asserts his crying while looking at the composite sketch in the newspaper was a communication between Defendant and Hart, his then-wife.
 

 *657
 
 "An action may be protected if it is intended to be a communication and is the type of act induced by the marital relationship."
 
 State v. Holmes,
 

 330 N.C. 826
 
 , 835,
 
 412 S.E.2d 660
 
 , 665 (1992) (citations omitted);
 
 see also
 

 State v. Fulcher,
 

 294 N.C. 503
 
 , 517,
 
 243 S.E.2d 338
 
 , 348 (1978) (noting "an act, such as a gesture, can be a declaration within the meaning of [ N.C. Gen.Stat. § 8-57 ].").
 

 The State argues Hart's testimony regarding the crying incident was properly admitted because no spousal communication occurred. The State reasons "[Defendant's] physical reaction upon seeing the composite picture could hardly be defined as a conscious statement, acknowledgment or gesture to his wife [.]" We agree.
 

 The incident occurred as Hart drove to a doctor's appointment with Defendant sitting in the passenger seat. Hart did not observe Defendant looking at the composite sketch of the victim's assailant and weeping until Hart heard a teardrop hit the newspaper. No testimony indicates Defendant intended to communicate anything to Hart by crying at the sight of the composite sketch.
 

 Defendant asserts the crying incident is analogous to an admission by silence. He argues "admissions by silence as well as admissions by words" are covered by the confidential communications privilege.
 
 State v. Wallace,
 

 162 N.C. 622
 
 , 630,
 
 78 S.E. 1
 
 , 4 (1913). Defendant did not communicate with his then-wife by crying in the car while looking at the composite sketch of the victim's assailant. Defendant also did not make an admission to his spouse through that act. Defendant's act of crying while riding in a vehicle with his then-wife is not protected confidential communication pursuant to N.C. Gen.Stat. § 8-57(c). Defendant's argument is overruled.
 

 IV. Jury Instruction on Lesser-Included Offense
 

 Defendant argues the trial court erred in failing to instruct the jury on the lesser-included offense of attempted rape. We disagree.
 

 A. Standard of Review
 

 A trial court's decision not to give a requested lesser-included offense instruction is reviewed
 
 de novo
 
 on appeal.
 
 State v. Gettys,
 

 219 N.C.App. 93
 
 , 100,
 
 724 S.E.2d 579
 
 , 585 (2012) (citing
 
 State v. Debiase,
 

 211 N.C.App. 497
 
 , 503-04,
 
 711 S.E.2d 436
 
 , 441,
 
 disc. rev. denied,
 

 365 N.C. 335
 
 ,
 
 717 S.E.2d 399
 
 , 400 (2011) ).
 

 *658
 

 B. Analysis
 

 The trial court "must instruct the jury upon a lesser[-]included offense when there is evidence to support it."
 
 State v. Brown,
 

 112 N.C.App. 390
 
 , 397,
 
 436 S.E.2d 163
 
 , 168 (1993) (citing
 
 State v. Wright,
 

 304 N.C. 349
 
 , 351,
 
 283 S.E.2d 502
 
 , 503 (1981) ). However, "when the State's evidence is clear and positive with respect to each element of
 
 *815
 
 the offense charged and there is no evidence showing the commission of a lesser[-]included offense, it is not error for the trial judge to refuse to instruct [the jury] on the lesser offense."
 
 State v. Hardy,
 

 299 N.C. 445
 
 , 456,
 
 263 S.E.2d 711
 
 , 718-19 (1980).
 

 To determine whether the evidence supports the submission of a lesser-included offense, "courts must consider the evidence in the light most favorable to [the] defendant."
 
 Debiase,
 

 211 N.C.App. at 504
 
 ,
 
 711 S.E.2d at 441
 
 (citations omitted). "Instructions pertaining to attempted first[-]degree rape as a lesser[-]included offense of first[-]degree rape are warranted when the evidence pertaining to the crucial element of penetration conflicts or when, from the evidence presented, the jury may draw conflicting inferences."
 
 State v. Johnson,
 

 317 N.C. 417
 
 , 436,
 
 347 S.E.2d 7
 
 , 18 (1986) (citation omitted),
 
 superseded by statute on other grounds by
 
 N.C. Gen.Stat. § 8C-1, Rule 404(b),
 
 as recognized in
 

 State v. Moore,
 

 335 N.C. 567
 
 ,
 
 440 S.E.2d 797
 
 (1994).
 

 In
 
 Johnson,
 
 the victim first testified the defendant had inserted his penis in her vagina on direct examination.
 
 317 N.C. at 436
 
 ,
 
 347 S.E.2d at 18
 
 . On cross-examination, however, the victim indicated the defendant had attempted to achieve penetration but was unsuccessful.
 

 Id.
 

 There was testimony the victim told a physician she "felt pressure but not penetration" and was uncertain whether penetration had occurred.
 

 Id.
 

 On appeal, our Supreme Court concluded this evidence created "a conflict as to whether penetration occurred which should have been resolved by the jury under appropriate instructions."
 

 Id.
 

 Here, Defendant contends the trial court should have given an instruction on the lesser-included offense of attempted rape because the evidence regarding penetration was equivocal. Defendant relies on the exchange between the prosecutor and the victim at trial. The prosecutor asked "[d]o you know whether or not [your assailant] penetrated your vagina with his penis" and the victim responded "I think he had a couple of times but he was choking me so hard that I was losing my breath and I believed I was going to die." Defendant asserts this exchange created a conflict in the evidence necessitating an instruction on the lesser-included offense of attempted rape. We disagree.
 

 *659
 
 The State presented substantial evidence of penetration: the sexual assault nurse testified the victim told her she was penetrated by Defendant. The victim told the examining doctor at the hospital immediately after the attack that Defendant had penetrated her. Defendant's semen was recovered from inside the victim's vagina and from her skin. When asked by the prosecutor at trial whether anything other than Defendant's hands had touched her, she replied her assailant had touched "[her] vagina" with his penis. Precedents clearly state that evidence of the penetration can be slight: " penetration, however slight, of the female sex organ by the male sex organ" is sufficient to warrant submission for first-degree rape.
 
 State v. Combs,
 

 226 N.C.App. 87
 
 , 90,
 
 739 S.E.2d 584
 
 , 586 (2013) (citations omitted).
 

 The victim also testified she was unsure of how long Defendant was inside of her, but did identify the Defendant in court when asked whether she saw "the person that pulled [her] out of the surf that night and ... penetrated [her] vagina with his penis." In addition, Dr. Baxter testified the victim's pelvic exam revealed sand in her vagina, and trauma to her vagina and cervix. Swabs taken from inside the victim's vagina and from her skin show the presence of Defendant's semen.
 

 We hold the victim's testimony and other competent evidence, viewed in the light most favorable to Defendant, did not create a conflict in the evidence to require an instruction on attempted first-degree rape. The trial court did not err by declining to give Defendant's requested instruction on attempted first-degree rape.
 

 V. Conclusion
 

 The trial court properly admitted Hart's testimony regarding her former husband crying
 
 *816
 
 while looking at a composite sketch of the victim's assailant. The incident was not a confidential spousal communication pursuant to N.C. Gen.Stat. § 8-57(c).
 

 The trial court did not err in declining to give an instruction on attempted first-degree rape. Defendant received a fair trial free from the prejudicial errors he preserved and argued.
 

 NO ERROR.
 

 Judges BRYANT and GEER concur.