BRYANT, Judge.
 

 *424
 
 Where
 
 N.C. Gen. Stat. § 8-57.1
 
 is applicable in any judicial proceeding in which the abuse of a child is in issue, the trial court did not err in applying section 8-57.1 to defendant's criminal prosecution for child sexual abuse. Further, because the privileged material was evidence of defendant's pattern or modus operandi and was not outweighed by its
 
 *425
 
 prejudicial effect, it was not erroneously admitted under Rules 401, 403, or 404(b), and we find no error in the judgment of the trial court.
 

 Ronnie Paul Godbey, defendant, and Karen Godbey ("Karen"), were married in 1996. At the time, Karen had two children: a three-year-old son and a daughter, Stephanie.
 
 [1]
 

 *823
 
 Karen and defendant later had two children together in 2002 and 2008. All four children lived with the couple.
 

 One day in May 2010, when Stephanie was nineteen years old, Karen asked Stephanie to help care for her siblings. Stephanie, who was on the phone with her boyfriend, said she already had plans. Karen asked Stephanie to get off the phone and when Stephanie refused, Karen pulled the phone away and slapped her. When Karen told Stephanie she had to stay home and babysit, Stephanie walked out, at which point Karen said, "[I]f you leave, don't come back."
 

 After this argument, Stephanie stayed with a friend, Millie, for a few weeks. At some point, Stephanie and Millie went to the home of Stephanie's maternal grandfather, Larry Gobble, where Millie told Gobble that her house was too small for Stephanie to continue staying with her. Stephanie told Gobble that she could not go back home and, Gobble, who testified for the State, said,
 

 well, here's the deal, unless you got some specific reason, like, you've been physically abused or you're in harms [sic] way of something being-in some kind of danger, you're not going to come to my house and live. You're going to go home and work the problems out with your mother.
 

 At this point, Stephanie told Gobble that defendant had "abused" her at night while Karen was sleeping, but did not go into further detail. Gobble asked Stephanie if she had told Karen, and Stephanie said she had not because she thought Karen would not believe her. Stephanie stayed with Millie for another week or so. Then, after discussing the situation with his pastor, Gobble allowed Stephanie to move into his home.
 

 At some point during the next day or two after Stephanie first told her grandfather about the alleged abuse, Gobble arranged for Stephanie to speak with Karen over the phone. Stephanie told Karen that defendant had been coming into her room and "messing with" her and "bothering" her, which Stephanie later testified at trial had been going on since she was about ten years old and continued until her eighteenth birthday.
 

 *426
 
 Stephanie and Karen agreed to meet to talk further and Stephanie told Karen that defendant "would do things to her" and "molest[ed]" her. Karen was upset and in tears and suggested talking to a pastor. Stephanie agreed, and the two met with a pastor that day.
 

 When Stephanie left the meeting with Karen and the pastor, Karen called defendant and asked him to meet her at the pastor's office. When he arrived, Karen confronted him with Stephanie's allegations. Defendant denied "messing with" Stephanie and appeared very upset. Karen and defendant then went home. Karen later testified that she decided to stay with defendant because she did not believe Stephanie's accusations.
 

 In December 2011, Detective Sarah Benfield with the Rowan County Sheriff's Department spoke with Gobble's pastor after the pastor reported a "past sex abuse." After speaking with the pastor, Detective Benfield interviewed Stephanie. Stephanie alleged that defendant frequently came into her room over the years and (1) rubbed her back, breasts, and vagina; (2) performed cunnilingus on her; (3) inserted his fingers into her vagina; and (4) forced her to perform fellatio. She also claimed that defendant would turn her over and "hump" her back until he ejaculated.
 

 Detective Benfield then talked with Karen and explained all of Stephanie's allegations, including the allegation that defendant would hump Stephanie's back until he ejaculated. About a week after Detective Benfield's meeting with Karen, Karen contacted the detective and said that when defendant engaged her in sexual activity, he would do the same "back humping" that Stephanie alleged defendant would do to her. Detective Benfield had Karen come in and read and sign a statement to that effect, dated 12 January 2012. About a month after she signed the 12 January 2012 statement, Karen contacted Detective Benfield again and told her she wanted to change her earlier statement. On 1 February 2012, Karen met with Detective
 
 *824
 
 Benfield and initialed and signed an amended statement, through which she explained that defendant's
 

 doing something on my back was my idea. We only did it a few times. He would hump me on my back until he ejaculated on my back. It was when I wasn't able to have intercourse. It was consensual, and something we did together intimately, not against my will.
 

 When Detective Benfield spoke with defendant, he denied having any sexual contact with Stephanie, said that Stephanie was lying, and told her that "this all started when she got kicked out of the house."
 

 *427
 
 On 2 April 2012, defendant was indicted on two counts of first degree sex offense with a child, one count of statutory sex offense with a 13-, 14-, or 15-year-old, and three counts of indecent liberties with a child. All six indictments alleged an offense date range of 30 March 2001 through 29 March 2007 (the day before Stephanie's sixteenth birthday). Two years later, superseding indictments issued for the two charges of sex offense with a child. The case came on for trial at the 2 December 2014 Criminal Session of Rowan County Superior Court, the Honorable Christopher W. Bragg, Judge presiding.
 

 Prior to trial, defendant moved to exclude any mention of sex acts between Karen and defendant, including references to Karen's statements to Detective Benfield. Defendant argued that private sex acts between a husband and wife were privileged marital communications under
 
 N.C. Gen. Stat. § 8-57
 
 (c). The trial court reserved judgment on the matter until Karen testified.
 

 At trial, Stephanie testified about the abuse, including the "back humping." During its case-in-chief, the State did not call Karen as a witness or elicit any testimony from Detective Benfield, or any other witness, about defendant and Karen's sex life. At the close of the State's evidence, defendant asked the trial court to revisit the privilege issue before presentation of defense evidence. While the trial court agreed that sex acts between Karen and defendant were privileged marital communications, it held
 
 N.C. Gen. Stat. § 8-57.1
 
 abrogated the privilege in this case.
 

 Prior to the relevant portions of Karen's testimony, defendant renewed his objection to the State's cross-examination about her sex acts with defendant and also objected to such questioning on relevance and Rule 404(b) grounds. The trial court reiterated its prior ruling and overruled defendant's additional objections, holding that evidence of sex acts between Karen and defendant was admissible under Rule 404(b) "almost as a modus operandi ... [to] show a pattern [of] conduct by [defendant]." On direct, Karen, called as a defense witness, mentioned that she gave statements on two occasions at the sheriff's department regarding Stephanie's allegations and that she signed a statement every time. She did not refer to, and defense counsel did not elicit, testimony regarding the substance of those statements.
 

 The State then cross-examined Karen, over contemporaneous objection, about her statements to Detective Benfield. Karen testified that the sexual activity in question did not begin until after the birth of her and defendant's second child in 2008 (thus, beginning after the date ranges
 
 *428
 
 alleged in the indictments). She explained that it did not entail defendant "humping" her back, but rather involved defendant rubbing his penis "between her butt." On redirect, Karen further explained the sex act she had described to Detective Benfield, stating that it involved defendant rubbing his penis between her oiled butt cheeks until he ejaculated, but that he never "humped" her back. Karen also explained that this was not something she enjoyed, but that it was her idea as sexual intercourse had become painful for her as a result of fibroids after her son's birth in 2008.
 

 Defendant testified and denied abusing or inappropriately touching Stephanie. He also testified on cross-examination as follows:
 

 Q. Did you ever hear about an allegation and you humping Stephanie's back until you ejaculated?
 

 A. Did-did I hear about it?
 

 Q. Yes.
 

 A. Yes, I heard about it. It's in the papers.
 

 Q. All right. That's something similar to what you and your wife do, correct?
 

 *825
 
 A. A little bit, but not-not really.
 

 Q. Your wife's testimony was that didn't begin until 2008, after [your son] was born?
 

 A. That's when she had her problems, yes.
 

 Defendant's ex-wife, son, and sister also testified as character witnesses. After the defense rested, the State re-called Detective Benfield, who testified about Karen's statements, noting that Karen never informed her that the activity she described with defendant only began in 2008. Defendant objected to this line of questioning for "reasons stated previously ... including privilege."
 

 In charging the jury, the trial court instructed, over defendant's objection that
 

 [e]vidence has been received tending to show that the defendant and [Karen] engaged in a sexual act where the defendant would rub his penis between her butt cheeks until the defendant ejaculated. This evidence was received solely for the purpose of showing that the defendant had the intent, which is a necessary element of the crime charged in this case, and that there existed in the mind
 
 *429
 
 of the defendant a common plan or scheme involving the crime charged in this case.
 

 If you believe this evidence, you may consider it, but only for the limited purpose for which it was received. You may not consider it for any other purpose.
 

 After about two-and-a-half hours of deliberation, the jury asked the trial court whether it had to find defendant guilty of the sex offense charges in order to convict him of the indecent liberties offenses. The jury also asked "how [to] determine which act applies" to each indecent liberties charge, noting that all three indictments were worded the same. The trial court responded by instructing the jury that each charged offense was "separate and distinct" and by reiterating the pattern instruction on indecent liberties.
 

 After another two-and-a-half hours of deliberation, the jury submitted a note to the trial court indicating it had reached a verdict in the sex offense cases, but was "unable to agree on an [sic] unanimous decision" in the indecent liberties cases. In response, the trial court dismissed the jury for the weekend and instructed it to return on Monday for further deliberations.
 

 When the jury returned Monday morning, it asked to review defense exhibits 1-14, which included an illustrative diagram of the Godbey family home and pictures of the family. At 2:42 p.m., the jury indicated it had reached a unanimous verdict in one of the indecent liberties cases, but, with regard to the remaining charges, the jury foreman told the court that he "believe[d] that [the jury] could spend days discussing [the] two remaining charges without reaching an [sic] unanimous decision."
 

 The trial court then gave the jury an
 
 Allen
 
 charge, typically given to encourage a deadlocked jury to try and reach a verdict, and allowed another hour and a half of deliberations. After the hour and a half of deliberations, the trial court declared a mistrial on the two remaining indecent liberties charges. In the other cases, the jury acquitted defendant of the three sex offense charges, but convicted him of one count of indecent liberties. Defendant was sentenced to sixteen to twenty months' imprisonment for the indecent liberties conviction and ordered to register as a sex offender for thirty years. Defendant entered oral notice of appeal.
 

 On appeal, defendant argues that the trial court erred (I) by admitting privileged evidence over objection about consensual sexual activity
 
 *430
 
 between defendant and his wife pursuant to
 
 N.C. Gen. Stat. § 8-57.1
 
 ; and (II) abused its discretion by overruling defendant's Rule 401 and 404(b) objections to evidence about consensual sexual activity between defendant and his wife.
 

 I
 

 Defendant first argues that the trial court erred by admitting, over objection, privileged evidence about consensual sexual activity between defendant and his wife and that this error entitles him to a new trial. Specifically, defendant contends the trial court erroneously concluded that the marital communications privilege did not apply to the evidence about spousal sexual activity as
 
 N.C. Gen. Stat. § 8-57.1
 
 waives that privilege.
 

 *826
 
 Defendant argues that N.C.G.S. § 8-57.1 does not completely abrogate the privilege, but rather is limited to "judicial proceeding[s] related to a report pursuant to the Child Abuse Reporting Law," and therefore the trial court erroneously concluded that N.C.G.S. § 8-57.1 creates a broad exception to the marital communications privilege in all cases. We disagree.
 

 Whether a communication is privileged is a question of law reviewed
 
 de novo
 
 by this Court.
 
 See
 

 Nicholson v. Thom
 
 ,
 
 236 N.C.App. 308
 
 , 318,
 
 763 S.E.2d 772
 
 , 779 (2014). " 'Under a
 
 de novo
 
 review, the court considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal."
 
 State v. Williams
 
 ,
 
 362 N.C. 628
 
 , 632-33,
 
 669 S.E.2d 290
 
 , 294 (2008) (quoting
 
 In re Appeal of the Greens of Pine Glen Ltd. P'ship
 
 ,
 
 356 N.C. 642
 
 , 647,
 
 576 S.E.2d 316
 
 , 319 (2003) ).
 

 "[T]he marital communications privilege is premised upon the belief that the marital union is sacred and that its intimacy and confidences deserve[ ] legal protection."
 
 State v. Rollins
 
 ,
 
 363 N.C. 232
 
 , 236,
 
 675 S.E.2d 334
 
 , 337 (2009) (citing
 
 Hicks v. Hicks
 
 ,
 
 271 N.C. 204
 
 , 205,
 
 155 S.E.2d 799
 
 , 800 (1967) ). "[W]hatever is known by reason of that intimacy should be regarded as knowledge confidentially acquired, and ... neither [spouse] should be allowed to divulge it to the danger or disgrace of the other."
 
 Hicks
 
 ,
 
 271 N.C. at 205
 
 ,
 
 155 S.E.2d at 800
 
 (citation omitted). In addition to protecting verbal expression, the marital communications privilege also protects actions which are "intended to be ... communication[s] and [are] the type of act[s] induced by the marital relationship."
 
 State v. Hammonds
 
 ,
 
 141 N.C.App. 152
 
 , 171,
 
 541 S.E.2d 166
 
 , 180 (2000) (citations omitted).
 

 In assessing whether an act or expression is confidential such that it is afforded the protection of the marital privilege, a court must ask whether it was "prompted by the affection, confidence, and loyalty engendered by" the marriage.
 

 *431
 

 Rollins
 
 ,
 
 363 N.C. at 237
 
 ,
 
 675 S.E.2d at 337
 
 (citations omitted);
 
 see also
 

 State v. Freeman
 
 ,
 
 302 N.C. 591
 
 , 596,
 
 276 S.E.2d 450
 
 , 453 (1981) (modifying the common law rule to hold that "spouses shall be incompetent to testify against one another in a criminal proceeding only if the substance of the testimony concerns a 'confidential communication' between the marriage partners made during the duration of their marriage"). A court must also consider "[t]he circumstances in which the communication takes place, including the physical location and presence of other individuals...."
 
 Rollins
 
 ,
 
 363 N.C. at 237
 
 ,
 
 675 S.E.2d at 337
 
 . There "must be a reasonable expectation of privacy on the part of the holder and the intent that the communication be kept secret."
 
 Id.
 
 at 238,
 
 675 S.E.2d at 338
 
 .
 

 The North Carolina Supreme Court has specifically held that sex between spouses is subject to the marital communications privilege.
 
 Wright v. Wright
 
 ,
 
 281 N.C. 159
 
 , 166-67,
 
 188 S.E.2d 317
 
 , 322 (1972) ;
 
 see
 

 Biggs v. Biggs
 
 ,
 
 253 N.C. 10
 
 , 16,
 
 116 S.E.2d 178
 
 , 183 (1960) ("[A]n act of intercourse between husband and wife is a confidential communication."),
 
 overruled in part by
 

 Hicks
 
 ,
 
 271 N.C. at 207
 
 ,
 
 155 S.E.2d at 802
 
 (declining to follow
 
 Biggs
 
 "where there [was] a completely different factual situation").
 

 While North Caroline General Statutes section 8-57 provides "[n]o husband or wife shall be compellable
 
 in any event
 
 to disclose any confidential communication made by one to the other during their marriage[,]"
 
 N.C. Gen. Stat. § 8-57
 
 (c) (2015) (emphasis added), there are exceptions:
 

 (b) The spouse of the defendant shall be
 
 competent but not compellable
 
 to testify for the State against the defendant in any criminal action or grand jury proceedings, except that the spouse of the defendant shall be both competent and compellable to so testify:
 

 ...
 

 (5) In a prosecution of one spouse for any other criminal offense against the minor child of either spouse, including any child of either spouse who is born out of wedlock or adopted or a foster child.
 

 Id.
 

 § 8-57(b)(5);
 
 see also
 

 Biggs
 
 ,
 
 253 N.C. at 16-17
 
 ,
 
 116 S.E.2d at 183
 
 ("It is true that an act of intercourse between husband and wife is a confidential communication. But the statute
 
 *827
 
 merely provides that 'no husband or wife shall be
 
 compellable
 
 to disclose any confidential communication.' [The husband's] testimony (and that of his wife) was
 
 voluntarily given
 
 ; there was no effort to compel such testimony." (emphasis added)). In
 
 *432
 
 other words, sections 8-57(b)(5) and (c) together provide that a witness-spouse may voluntarily testify about the abuse of a child, even over the objection of the defendant-spouse, but may not be compelled to do so. N.C.G.S. § 8-57(b)(5), (c).
 

 N.C. General Statutes, section 8-57.1, however, abrogates the marital communications privilege even further with regard to cases of child abuse:
 

 Notwithstanding the provisions of G.S. 8-56 and G.S. 8-57, the husband-wife privilege shall not be ground for excluding evidence regarding the abuse or neglect of a child under the age of 16 years or regarding an illness of or injuries to such child or the cause thereof in any judicial proceeding related to a report pursuant to the Child Abuse Reporting Law, Article 3 of Chapter 7B of the General Statutes of North Carolina.
 

 N.C.G.S. § 8-57.1 (2015).
 

 "Questions of statutory interpretation are questions of law[.] ..."
 
 First Bank v. S & R Grandview, L.L.C.
 
 ,
 
 232 N.C.App. 544
 
 , 546,
 
 755 S.E.2d 393
 
 , 394 (2014). "The primary objective of statutory interpretation is to give effect to the intent of the legislature."
 

 Id.
 

 (citing
 
 Polaroid Corp. v. Offerman
 
 ,
 
 349 N.C. 290
 
 , 297,
 
 507 S.E.2d 284
 
 , 290 (1998) ). "The plain language of a statute is the primary indicator of legislative intent."
 

 Id.
 

 (citation omitted). "If the statutory language is clear and unambiguous, the court eschews statutory construction in favor of giving the words their plain and definite meaning."
 
 State v. Beck
 
 ,
 
 359 N.C. 611
 
 , 614,
 
 614 S.E.2d 274
 
 , 277 (2005) (citation omitted). However, "statutory provisions must be read in context: 'Statutes dealing with the same subject matter must be construed
 
 in pari materia
 
 , as together constituting one law, and harmonized to give effect to each.' "
 
 First Bank
 
 ,
 
 232 N.C.App. at 546
 
 ,
 
 755 S.E.2d at 395
 
 (quoting
 
 Williams v. Williams
 
 ,
 
 299 N.C. 174
 
 , 180-81,
 
 261 S.E.2d 849
 
 , 854 (1980) );
 
 see
 

 Abernethy v. Bd. of Commr's of Pitt Cnty.
 
 ,
 
 169 N.C. 631
 
 , 636,
 
 86 S.E. 577
 
 , 580 (1915) (noting that in construing statutes, the court "may call to [its] aid ... other laws or statutes related to the particular subject or to the one under construction, so that [it] may know what the mischief was which the Legislature intended to remove or remedy").
 

 General Statutes, section 8-57 is titled "Husband and wife as witnesses in criminal actions," and subsection (c) states as follows: "No husband or wife shall be compellable
 
 in any event
 
 to disclose any confidential communication made by one to the other during their marriage."
 

 *433
 
 N.C.G.S. § 8-57(c) (emphasis added). Section 8-57(c) provides that confidential communications between a husband and wife shall not be admitted into evidence at the objection of either the husband or the wife.
 
 State v. Holmes
 
 ,
 
 330 N.C. 826
 
 , 827, 829,
 
 412 S.E.2d 660
 
 , 661, 662 (1992) ;
 
 cf.
 

 Biggs
 
 ,
 
 253 N.C. at 16-17
 
 ,
 
 116 S.E.2d at 183
 
 . Section 8-57.1, titled "Husband-wife privilege waived in child abuse," states in pertinent part as follows: "
 
 Notwithstanding the provisions of G.S. 8-56 and G.S. 8-57
 
 , the husband-wife privilege shall not be ground for excluding
 
 evidence regarding the abuse or neglect of a child under the age of 16 years
 
 ...." N.C.G.S. § 8-57.1 (emphasis added).
 

 The only North Carolina case which cites to this statutory provision quotes the statute as follows: " Section 8-57.1 provides that notwithstanding the provisions of sections 8-56 and 8-57, 'the husband-wife
 
 privilege
 
 shall not be ground for excluding evidence [under certain circumstances relating to the abuse or neglect of a child under the age of sixteen years].' "
 
 Holmes
 
 ,
 
 330 N.C. at 834
 
 ,
 
 412 S.E.2d at 664-65
 
 (alteration in original) (quoting N.C.G.S. § 8-57.1 ).
 

 In
 
 Holmes
 
 , two codefendants were found guilty of second-degree murder, and at issue on appeal was "whether a witness spouse may testify at trial as to confidential communications made to her by defendant spouse over defendant spouse's objection and assertion of privilege."
 
 Id.
 
 at 827,
 
 412 S.E.2d at 661
 
 . In holding that "she may not," the N.C. Supreme Court cited to N.C.G.S. § 8-57.1 for the purpose of negating the State's argument that N.C.G.S. § 8-57 "abolishe[d] the
 
 *828
 
 common law rule against the disclosure of confidential marital communications, leaving only a rule against being
 
 compelled
 
 to disclose a confidential marital communication ... argu[ing] that section 8-57(b) makes the spouse
 
 competent
 
 to testify, and section 8-57(c) gives the privilege of not being
 
 compelled
 
 to the witness spouse...."
 
 Id.
 
 at 827, 829,
 
 412 S.E.2d at 661, 662
 
 (emphasis added).
 

 In negating the State's argument outlined above, the N.C. Supreme Court reasoned that, "[i]f, as the State suggests, section 8-57 abolished the husband-wife privilege against disclosure of confidential communications made by one to the other during their marriage, section 8-57.1 would seem to be unnecessary."
 
 Id.
 
 at 834,
 
 412 S.E.2d at
 
 665 ;
 
 see also
 
 Note, Douglas P. Arthurs, Spousal Testimony in Criminal Proceedings-
 
 State v. Freeman
 
 ,
 
 17 Wake Forest L. Rev. 990
 
 , 995 (1981) (noting that " G.S. 8-57 was adopted to eliminate the incongruous result that a defendant could testify in his own behalf, but his spouse could not testify for or against him"). In other words, because N.C.G.S. § 8-57.1 abrogates the marital communications privilege "under certain circumstances" (not
 
 *434
 
 those present in
 
 Holmes
 
 ), N.C.G.S. § 8-57.1 would be redundant if section 8-57 functioned to abolish the privilege in its entirety.
 
 See
 

 Holmes
 
 ,
 
 330 N.C. at 833-34
 
 ,
 
 412 S.E.2d at
 
 664-65 ;
 
 see also
 

 State v. Williams
 
 ,
 
 286 N.C. 422
 
 , 431,
 
 212 S.E.2d 113
 
 , 119 (1975) ("[A] statute must be construed, if possible, so as to give effect to every part of it, it being presumed that the Legislature did not intend any of its provisions to be surplusage." (citation omitted));
 
 In re Hickerson
 
 ,
 
 235 N.C. 716
 
 , 721,
 
 71 S.E.2d 129
 
 , 132 (1952) ("[P]arts of the same statute, and dealing with the same subject, are to be considered and interpreted as a whole, and in such case it is the accepted principle of statutory construction that every part of the law shall be given effect if this can be done by any fair and reasonable intendment...." (citations omitted)). This line of reasoning provides guidance to this Court in deciding the ultimate breadth of this statute's reach and whether or not N.C.G.S. § 8-57.1 is applicable in this case.
 

 Although not binding on this Court, a Kentucky Supreme Court opinion has addressed this precise issue: whether a child abuse reporting statute which abrogates the marital privilege in child abuse cases may be applied to a
 
 criminal
 
 prosecution of a defendant for the sexual abuse of a child.
 
 Mullins v. Commonwealth
 
 ,
 
 956 S.W.2d 210
 
 , 210-11 (Ky. 1997). In
 
 Mullins
 
 , the defendant's wife "found him engaged in acts of sodomy with a 14-year-old babysitter."
 

 Id.
 

 at 211
 
 . The wife called the police and later testified against her husband to the grand jury.
 

 Id.
 

 However, by the time of trial, both the defendant and his wife claimed the marital privilege.
 

 Id.
 

 The Kentucky Court of Appeals affirmed the defendant's conviction for third-degree sodomy, stating that the trial court did not err in applying KRS 620.050(2) (Kentucky's statute abrogating both the professional-client/patient privilege and the marital privilege in cases of dependent, neglected, or abused children) in a criminal prosecution, stating the statute "declares that the husband and wife privilege is inapplicable in a
 
 criminal
 
 proceeding regarding a dependent, neglected or abused child."
 

 Id.
 

 (emphasis added).
 

 In affirming the Court of Appeals' and the judgment of the trial court, the Kentucky Supreme Court reasoned as follows:
 

 The General Assembly may legislate in order to protect children, and it may determine that children's rights are paramount when there is a conflict with the privilege of an adult to exclude evidence regarding the abuse, dependency or neglect of a child. KRS Chapter 620 meets the legislative purpose of safeguarding the interests of children. The statute does not interfere with any judicial function, but rather it enhances it by refusing to allow a shield
 
 *435
 
 to a child abuser in the form of the husband-wife privilege and thereby improves the truth-finding function of the judicial process.
 

 The exceptions provided in KRE 504(c)(2) reflect the fact that the marital privilege is considered by many to be in disfavor as a result of abuses which prevent ascertaining the truth. The privilege exists only to protect marital harmony....
 

 *829
 
 The courts have approached the privilege by narrowly and strictly construing it because it has the potential for shielding the truth from the court system. Many courts have determined that when the reason supporting the privilege, marital harmony, no longer exists, then the privilege should not apply to hide the truth from the trier of fact.
 

 ....
 

 Marital harmony can hardly be a valid legal principle when the wife in question calls the police to report the alleged sexual misdeeds of her husband with a child. The marital privilege is subordinate or inferior to the right of a child to be free from sexual abuses.
 

 Id.
 

 at 212
 
 (internal citations omitted);
 
 see
 

 Kays v. Commonwealth
 
 ,
 
 505 S.W.3d 260
 
 , ----, NO. 2014-CA-001924-MR,
 
 2016 WL 5956995
 
 , at *8 (Ky. Oct. 14, 2016) (citing
 
 Mullins
 
 ,
 
 956 S.W.2d at
 
 211 ) (involving third-degree rape and sodomy of a fifteen-year-old-girl where the defendant confided in his then-wife "[w]hen details of how he preyed upon his former student began unraveling" and the defendant sought to invoke spousal privilege) ("
 
 Mullins
 
 remains the law in Kentucky.").
 

 Furthermore, the
 
 North Carolina Juvenile Code: Practice and Procedure
 
 's interpretation of North Carolina's statute abrogating the marital privilege in cases of child abuse, N.C.G.S. § 8-57.1, seems to support a similar policy to the one enunciated in
 
 Mullins
 
 , namely that "[t]he marital privilege is subordinate or inferior to the right of a child to be free from sexual abuses."
 
 956 S.W.2d at 212
 
 .
 
 Practice and Procedure
 
 states that "with respect to certain privileges, the privilege does not extend to circumstances where the information requires a mandatory report of child neglect or abuse
 
 or where the information otherwise pertains to and is being sought in a proceeding concerning the abuse and neglect of a child
 
 ." Thomas R. Young,
 
 N.C. Juvenile Code: Prac. & Proc.
 
 § 5:2 (May 2016) (emphasis added).
 

 *436
 
 Even if N.C.G.S. § 8-57.1 is not a model of clarity, N.C. Gen. Stat. § 7B-310 contains similar language, and reading N.C.G.S. § 8-57.1 as applicable to "any judicial proceeding" is supported by the express limitations placed upon all privileges as enunciated in N.C.G.S. § 7B-310 :
 

 No privilege, except the attorney-client privilege, shall be grounds for excluding evidence of abuse, neglect, or dependency
 
 in any judicial proceeding
 
 (civil,
 
 criminal
 
 , or juvenile) in which a juvenile's abuse, neglect, or dependency is in issue
 
 nor
 
 in any judicial proceeding resulting from a report submitted under this Article, both as this privilege relates to the competency of the witness and to the exclusion of confidential communications.
 

 N.C.G.S. § 7B-310 (2015) (emphasis added).
 

 In
 
 State v. Byler
 
 , this Court examined and compared the language of
 
 N.C. Gen. Stat. § 8-53.1
 
 (regarding the physician-patient privilege) and N.C.G.S. § 7B-310, ultimately concluding that "these two sections are to be read together[,]" as "the doctor-patient privilege cannot serve to shield information from the jury when a defendant is on trial for child abuse." No. COA03-453,
 
 2004 WL 2584962
 
 , at *3 (N.C. Ct. App. Nov. 16, 2004) (unpublished) (citation omitted) (affirming the trial court's admission of statements made by a psychologist who was hired by defense counsel to evaluate the defendant in the defendant's prosecution for the statutory rape of his own daughter). Because the language in N.C.G.S. § 8-53.1 almost exactly mirrors the language of N.C.G.S. § 8-57.1,
 
 [2]
 
 with the exception that section 8-53.1 deals with physician-patient privilege and section 8-57.1 with the marital privilege, this Court's analysis in
 
 Byler
 
 is highly instructive:
 

 [T]he plain language of section 7B-310 seems to create dual applicability by using
 
 *830
 
 the word "nor" and admonishing the use of the privilege in a "judicial proceeding" where
 
 *437
 
 abuse is at issue, independent of whether the proceeding resulted from a report. This interpretation is bolstered by the fact that section 8-53.1 uses "related to" instead of "resulting from," as in 7B-310 and these two sections are to be read together.
 
 See
 

 State v. Etheridge
 
 ,
 
 319 N.C. 34
 
 , 39-41,
 
 352 S.E.2d 673
 
 , 677-78 (1987) (supporting this interpretation and applying these statutes to a criminal trial based on rape and other sexual offenses).
 

 Id.
 

 ;
 
 see
 
 N.C.G.S. § 8-57.1 ("[T]he husband-wife privilege shall not be ground for excluding evidence regarding the abuse ... of a child ... in any judicial proceeding
 
 related to
 
 a report pursuant to the Child Abuse Reporting Law....");
 
 see also
 
 Young,
 
 N.C. Juvenile Code: Prac. & Proc.
 
 § 5:2 n.14 ("
 
 N.C. Gen. Stat. § 8-53.1
 
 (physician and nurse privilege not ground for excluding evidence regarding abuse or neglect of a child under the age of 16 years in Chapter 7B proceeding);
 
 N.C. Gen. Stat. § 8-57.1
 
 (
 
 husband and wife privilege same as physician and nurse
 
 )[.]" (emphasis added)).
 

 Thus, in the instant case, independent of whether defendant's prosecution for,
 
 inter alia
 
 , taking indecent liberties with a child
 
 resulted from
 
 a report made pursuant to the Child Abuse Reporting Law, it is sufficient that defendant's criminal prosecution for child sexual abuse was a "judicial proceeding
 
 related to
 
 a report pursuant to" the same.
 
 See
 
 N.C.G.S. § 8-57.1 ;
 
 Byler
 
 ,
 
 2004 WL 2584962
 
 , at *3. As such, sections 8-57.1 and 7B-310 "are to be read together[,]"
 
 Byler
 
 ,
 
 2004 WL 2584962
 
 , at *3, and, in a criminal proceeding regarding allegations of the sexual abuse of a juvenile, like the instant case, with the exception of the attorney-client privilege, "[n]o privilege," including the marital communications privilege, can be exercised to exclude evidence of such abuse.
 
 See
 
 N.C.G.S. § 7B-310 ;
 
 see also
 
 N.C.G.S. § 8-57.1.
 

 "We believe the legislature, in balancing the [long-standing policy "to protect the intimacy of the marital union[,]"
 
 Rollins
 
 ,
 
 363 N.C. at 235
 
 ,
 
 675 S.E.2d at 336
 
 ,] against the need to protect child victims, opted to provide the broadest possible exceptions to the [marital communications] privilege."
 
 See
 

 State v. Etheridge
 
 ,
 
 319 N.C. 34
 
 , 41,
 
 352 S.E.2d 673
 
 , 677 (1987) ("We believe the legislature, in balancing the need for confidential medical treatment against the need to protect child victims, opted to provide the broadest possible exceptions to the physician-patient privilege."). Accordingly, the trial court did not err in applying N.C.G.S. § 8-57.1 to defendant's prosecution for child sexual abuse offenses, and defendant's argument is overruled.
 

 *438
 

 II
 

 Defendant next argues the trial court abused its discretion by overruling defendant's Rule 401 and 404(b) objections to the admission of the same evidence described above-the consensual sexual activity between defendant and his wife. Specifically, defendant argues Karen's testimony regarding the sexual act was irrelevant as it was neither temporally proximate nor similar enough to Stephanie's allegations to warrant admission under Rule 404(b) and, further, that even if Karen's testimony had some minimal probative value, that value was substantially outweighed by the danger of unfair prejudice. Defendant contends that because there is a reasonable possibility that the trial court's errors contributed to defendant's conviction, he should be granted a new trial. We disagree.
 

 "Evidentiary errors are harmless unless a defendant proves that absent the error a different result would have been reached at trial."
 
 State v. Ferguson
 
 ,
 
 145 N.C.App. 302
 
 , 307,
 
 549 S.E.2d 889
 
 , 893 (2001) (citation omitted).
 

 Because the trial court is better situated to evaluate whether a particular piece of evidence tends to make the existence of a fact of consequence more or less probable, the appropriate standard of review for a trial court's ruling on relevancy pursuant to Rule 401 is not as deferential as the 'abuse of discretion' standard which applies to rulings made pursuant to Rule 403.
 

 Dunn v. Custer
 
 ,
 
 162 N.C.App. 259
 
 , 266,
 
 591 S.E.2d 11
 
 , 17 (2004) (citation omitted). Pursuant to Rule 401, evidence is relevant if it has
 
 *831
 
 any tendency to make the existence of a fact of consequence more or less probable. N.C. Gen. Stat. § 8C-1, Rule 401 (2015). "We review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b)."
 
 State v. Beckelheimer
 
 ,
 
 366 N.C. 127
 
 , 130,
 
 726 S.E.2d 156
 
 , 159 (2012). Rule 404(b) is a
 

 general rule of
 
 inclusion
 
 of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but
 
 one exception
 
 requiring its exclusion if its
 
 only
 
 probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged.
 

 State v. Coffey
 
 ,
 
 326 N.C. 268
 
 , 278-79,
 
 389 S.E.2d 48
 
 , 54 (1990). "[A]ll evidence favorable to the [State] will be, by definition, prejudicial
 
 *439
 
 to defendants. The test ... is whether that prejudice to defendants is unfair."
 
 Matthews v. James
 
 ,
 
 88 N.C.App. 32
 
 , 39,
 
 362 S.E.2d 594
 
 , 599 (1987). "The term 'unfair prejudice' means 'an undue tendency to suggest decision on an improper basis[.]' "
 
 State v. Summers
 
 ,
 
 177 N.C.App. 691
 
 , 697,
 
 629 S.E.2d 902
 
 , 907 (2006) (alteration in original) (quoting
 
 State v. DeLeonardo
 
 ,
 
 315 N.C. 762
 
 , 772,
 
 340 S.E.2d 350
 
 , 357 (1986) ).
 

 Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.
 

 N.C. Gen. Stat. § 8C-1, Rule 404(b) (2015). "[P]rior acts are sufficiently similar if there are some unusual facts present in both [act]s that would indicate that the same person committed them."
 
 State v. Davis
 
 ,
 
 222 N.C.App. 562
 
 , 567,
 
 731 S.E.2d 236
 
 , 240 (2012) (citation omitted). "Two constraints govern admission of evidence under Rule 404(b) : similarity and temporal proximity."
 
 Summers
 
 ,
 
 177 N.C.App. at 696
 
 ,
 
 629 S.E.2d at 906
 
 (citation omitted).
 

 Here, Stephanie described to Karen the sexual act performed by defendant, which description initially prompted Karen to sign a statement indicating she and defendant engaged in the same act. Stephanie testified the sexual act was a follows: "[Defendant] would turn [her] over on [her] stomach and he would hump [her] back until he ejaculated all over [her] back." Over defendant's objections before and during the following testimony, Karen testified on cross-examination as follows:
 

 Q. Was one of [Stephanie's] allegations Detective Benfield told you about, where [defendant] would go into [Stephanie's] room and hump her back until he ejaculated?
 

 A. Yes.
 

 Q. All right. Did that allegation surprise you?
 

 A. Every allegation surprised me.
 

 Q. Okay. Is that something that [defendant] and you did intimately together?
 

 ...
 

 A. It was. And when you-when she said it, I-I thought about it, and I called her, and I discussed it with her. And
 
 *440
 
 then later on, it-it was an issue after I had [my son in 2008]. I had problems, so it was-it was something that I came up with because we couldn't do anything, but it wasn't the exact act either.
 

 Q. All right. Well tell me about the act then, ma'am.
 

 ...
 

 A. I had-after I had [my son] I had fibroids, so-which is a female-well, it was in your-in your-on your female organs. So it would be painful to have intercourse. So I suggested that defendant-it-it was-see, when you-when you hear front and back on your-you know, the-I mean, this is your front and this is your back, so I automatically thought about my-you know, it's your backside. But it was in an area-it was not on my back, it was between my butt and it was-that he would-we would just-he would move around there until-in the butt area.
 

 Q. Until he ejaculated?
 

 A. Yes.
 

 Here, Karen's testimony was relevant to Stephanie's allegations-the sexual act Karen described was admissible as it showed a common scheme or plan, pattern, and/or common modus operandi and sufficient similarity to Stephanie's allegations of sexual abuse.
 
 See
 
 N.C.G.S. § 8C-1, Rule 404(b).
 

 *832
 
 Both Stephanie and Karen testified that defendant would engage in a sexual act whereby defendant would ejaculate on them, respectively, from behind. Even if Karen later amended her statement to differentiate the sexual act she and defendant engaged in from the sexual act Stephanie alleged defendant perpetrated on her, Detective Benfield testified that in her initial conversation with Karen, Karen "stated ... that [defendant] did the same thing to her[,]" and Karen herself testified that the sexual act alleged by Stephanie whereby defendant would "hump her back," was one that she and defendant also engaged in. Indeed, where Karen's credibility as a witness is called into question, particularly with regard to the differing statements she made to Detective Benfield, credibility goes to the weight of the evidence, not its admissibility.
 
 See
 

 State v. Stager
 
 ,
 
 329 N.C. 278
 
 , 317,
 
 406 S.E.2d 876
 
 , 898 (1991) ("The conflict in the evidence goes to the weight and credibility of the evidence not its admissibility.").
 

 Defendant argues that the instant case is similar to
 
 State v. Dunston
 
 , in which the charges arose out of allegations that the defendant vaginally
 
 *441
 
 and anally raped his foster daughter.
 
 161 N.C.App. 468
 
 , 469,
 
 588 S.E.2d 540
 
 , 542 (2003). In
 
 Dunston
 
 , the State elicited testimony from the defendant's wife that the defendant engaged in and liked consensual anal sex.
 
 Id.
 
 at 469, 472-73,
 
 588 S.E.2d at 542, 544-45
 
 . This Court concluded that this fact, "[wa]s not by itself sufficiently similar to engaging in anal sex with an underage victim
 
 beyond the characteristics inherent to both
 
 , i.e., they both involve anal sex, [in order] to be admissible under Rule 404(b)."
 
 Id.
 
 at 473,
 
 588 S.E.2d at 544-45
 
 (emphasis added). This Court held "this evidence was not relevant for any purpose other than to prove [the] defendant's propensity to engage in anal sex, and thus, the trial court erred in admitting this evidence."
 
 Id.
 
 at 473,
 
 588 S.E.2d at 545
 
 .
 

 Here, the evidence was not offered to prove defendant's propensity to engage in a categorically defined sexual act, but rather was offered to show the similarity between the unique sexual act alleged by Stephanie and that described by Karen. Indeed, the sexual act alleged by Stephanie was so unique that Karen called Detective Benfield back after they spoke the first time as soon as she realized that she and defendant engaged in a sexual activity similar to the one Stephanie described:
 

 Q. ... And when Detective Benfield told you [about Stephanie's allegation that defendant would go into her room and hump her back until he ejaculated], what did you say to her?
 

 A. I didn't say anything at the time until I went home and thought about everything.
 

 Q. All right. And then you called her back and told her that you had thought about that specific act, correct?
 

 A. Uh-huh, (affirmative.) Yes.
 

 Karen described this particular sexual activity to Detective Benfield on two separate occasions and signed a statement to that effect which she read and understood before she signed it. Karen's statement read as follows:
 

 [Defendant] doing something on my back was my idea. We only did this a few times. He would hump me on my back until he ejaculated on my back. It was when I wasn't able to have intercourse. It was consensual, and something we did together intimately, not against my will.
 

 The instant case is distinguishable from
 
 Dunston
 
 in that it does not involve a categorical or easily-defined sexual act, i.e., anal sex. Rather,
 
 *442
 
 the instant case involves a more unique sexual act which both Stephanie and Karen described, at some point, as defendant "hump[ing] on [the] back until he ejaculated on [the back]." Accordingly, the State was able to show sufficient similarity between the acts "beyond those characteristics inherent to [the act]."
 
 See
 

 State v. Al-Bayyinah
 
 ,
 
 356 N.C. 150
 
 , 155,
 
 567 S.E.2d 120
 
 , 123 (2002) (citation omitted).
 

 With regard to the "temporal proximity" prong of the Rule 404(b) analysis, "remoteness in time
 
 generally
 
 affects only the weight to be given [404(b) ] evidence, not its admissibility."
 
 State v. Maready
 
 ,
 
 362 N.C. 614
 
 , 624,
 
 669 S.E.2d 564
 
 , 570 (2008) (alteration in original) (quoting
 
 State v. Parker
 
 ,
 
 354 N.C. 268
 
 , 287,
 
 553 S.E.2d 885
 
 , 899 (2001) ). "Remoteness for purposes of 404(b) must be considered in light of the specific facts of each case and the purposes for which the evidence is being offered."
 
 State v. Mobley
 
 ,
 
 200 N.C.App. 570
 
 , 577,
 
 684 S.E.2d 508
 
 , 512 (2009)
 

 *833
 
 (quoting
 
 State v. Hipps
 
 ,
 
 348 N.C. 377
 
 , 405,
 
 501 S.E.2d 625
 
 , 642 (1998) ).
 

 Here, Stephanie told Detective Benfield that the sexual abuse began in 2002, when she was about ten or eleven years old, and persisted until approximately 2010, when she was about eighteen years old. According to Karen, after the birth of her son in 2008, she developed fibroids. As it was painful for Karen to have intercourse, she suggested defendant have sex with her from the "backside," "in the butt area," until defendant ejaculated. Karen also testified that at no time prior to 2008 did she and defendant either "have sex by [defendant] inserting his penis between [her] butt cheeks" or "have any sex ... from the back end[.]" Furthermore, Karen did not, at any point, indicate to Detective Benfield in her many statements that the sexual activity at issue occurred in any particular timeframe, nor did she tell Detective Benfield that this activity only happened after her son was born.
 

 Defendant argues that as both defendant and Karen testified that they did not engage in the sexual activity described above until after their son was born in 2008, at which time Stephanie was seventeen years old, and none of the indictments alleged that defendant abused Stephanie after she turned sixteen, the consensual sexual activity at issue between defendant and Karen was too remote in time because it did not begin until at least a year after the last alleged incident of abuse. However, where, as here, that timeline is dependent on Karen and defendant's testimony to that effect, and as remoteness in time generally affects only the weight to be given Rule 404(b) evidence and not its admissibility, the sexual act described by Karen is not too remote in time from the acts Stephanie alleged for purposes of Rule 404(b).
 

 *443
 
 Finally, the probative value of this evidence was not outweighed by the danger of undue prejudice. Whether the trial court should have excluded such evidence under Rule 403 is reviewed by this Court for abuse of discretion.
 
 State v. Whaley
 
 ,
 
 362 N.C. 156
 
 , 160,
 
 655 S.E.2d 388
 
 , 390 (2008) (citations omitted);
 
 State v. Boyd
 
 ,
 
 321 N.C. 574
 
 , 578,
 
 364 S.E.2d 118
 
 , 120 (1988) (finding "no abuse of discretion by the trial court in failing to exclude ... testimony under the balancing test of Rule 403 since the alleged incident was sufficiently similar to the act charged and not too remote in time"). Not only was the evidence of great probative value, but it was also not so sensitive to be potentially inflammatory to the jury (the jury acquitted defendant of five of the six charges). Thus, we conclude the probative value of this evidence as proof of defendant's pattern or modus operandi is not outweighed by its prejudicial effect. Accordingly, we find no abuse of discretion by the trial court in admitting this testimony under Rule 403, nor did the trial court err in its rulings pursuant to Rules 401 and 404(b).
 

 NO ERROR.
 

 Judges DILLON and ZACHARY concur.
 

 [1]
 

 Because the victim was a minor during the time the crimes were committed, a pseudonym is used to protect her identity.
 

 [2]
 

 N.C.G.S. § 8-53.1 reads as follows:
 

 (a) Notwithstanding the provisions of G.S. 8-53 and G.S. 8-53.13, the physician-patient or nurse privilege shall not be a ground for excluding evidence regarding the abuse or neglect of a child under the age of 16 years or regarding an illness of or injuries to such child or the cause thereof in any judicial proceeding related to a report pursuant to the North Carolina Juvenile Code, Chapter 7B of the General Statutes of North Carolina.
 

 N.C.G.S. § 8-53.1(a) (2015).